**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

GUY CHOATE and JEFFREY RICKMAN                                    PLAINTIFFS

V.                                    **4:07-CV-01170-WRW**

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.                                                DEFENDANTS

<u>ORDER</u>

 Pending are Defendants' Motions for Summary Judgment (Doc. Nos. 13, 40). Plaintiffs

filed a Response and Cross-Motion for Summary Judgment (Doc. No. 22). Defendants replied.[1]

Also pending are Plaintiffs' Motion to Supplement Administrative Record (Doc. No. 25) and

Defendants' Motion to Strike Motion to Supplement Administrative Record (Doc. No. 39).

 Based on the findings of fact and conclusions of law below, Plaintiffs' Motion for

Summary Judgment is GRANTED as to their claim that Defendants violated NEPA; and

Defendants' Motions for Summary Judgment are DENIED.

**I.**  **BACKGROUND**[2]

 **A.**  **Public Notice**

 In December, 2002, MBC Development Group ("MBC") submitted an application to the

United States Army Corps of Engineers ("Corps") for a permit under Section 404 of the Clean

Water Act[3] to allow MBC "to develop a multi-use lifestyle center and wetland park in central

---

 [1]Doc. No. 28.

 [2]Unless otherwise cited, the Background facts are taken from the parties' Statements of
Undisputed Material Fact (Doc. Nos. 14, 21, 40-3).

 [3]33 U.S.C. § 1344(a).

Arkansas" ("the Shoppes")[4] in an area of North Little Rock known as the Dark Hollow Basin.[5]

The Corps issued a "Joint Public Notice" on November 12, 2003, which reads, in part:

> [MBC] has requested authorization for the placement of dredged and fill material in the waters of the United States associated with the construction of a multi-tenant, multi-structure commercial development to be known as The Shoppes at North Hills. The development site would encompass approximately 120 acres . . . requiring the placement of fill material in approximately 31 acres of forest wetlands. A large drainage ditch is located within the development site. The ditch would be modified/enhanced by cleaning it out and reshaping . . . . The applicant proposes compensatory mitigation for the loss of wetland functions.[6]

The notice also detailed various types and quantities of wetlands that would be affected, as well as MBC's proposal for "the development of nature trails and park visitor center."[7] Of the 200 acres affected by the Shoppes, approximately 64 acres are wetlands.

## B.    Comments to Public Notice

Numerous state and federal agencies, public officials, private organizations, and citizens responded to the Public Notice.[8] Several of the responses contended that there are problems with

---

[4]AR at 405. The Shoppes will include restaurants, entertainment venues, and retail establishments comprising about 850,000 square feet on an approximately 200-acre site. The Shoppes will be bordered by I-40 to the north, I-30 to the west, a commercial/industrial park and multi-family housing to the south, and unimproved fields to the east.

[5]The Dark Hollow Basin covers approximately 6,000 acres in North Little Rock, the northern and western portions of which consist of relatively steep, hilly terrain north of Interstate 40 and west of Interstate 30.

The wetlands in the Dark Hollow Basin contribute directly to the water quality of the Arkansas River and flood control in areas adjacent to Dark Hollow. The wetlands filter out pollutants and debris washed into the area from upstream and from the Interstate highways, and provide sanctuary and breeding grounds for birds, small mammals, certain fish, and amphibians.

From the Dark Hollow Basin, the water flows through several ditches (including a ditch known as "the Big Ditch" that crosses the Shoppes site in an east-west direction) and ultimately all of the water flows south toward the Arkansas River through the tunnel known as the "Redwood Tunnel," which was constructed in 1911.

[6]AR at 407.

[7]*Id.*

[8]The EPA, the FWS, the Federal Highway Administration, the Arkansas Department of Environmental Quality, the Arkansas Game and Fish Commission, the Arkansas Soil and Water

site access, flood storage, non-point pollution, alternatives, filters, pollutant runoff, buffers, and

mitigation. The Environmental Protection Agency ("EPA") and U.S. Fish & Wildlife Service

("FWS") suggested denial of the permit because the Shoppes, as proposed, would result in

"substantial and unacceptable impacts" to the area;[9] but these agencies eventually approved the

project.[10]

### C.    Corps's Concerns

On January 12, 2004, the Corps determined "four main issues" needed to be considered:

(1) alternative analysis; (2) highway access; (3) wetland impacts and mitigation; and (4) flood

storage impacts and mitigation[11]  As late as December 9, 2004, the Corps believed that "an EIS

might be needed to address flooding and traffic issues and loss of wetland functions."[12]

### 1.    Alternative Analysis

MBC's preferred site -- in Dark Hollow Basin -- is called "the North Hills site."  In

January, 2004, the Corps directed MBC to provide "on-site modification of plans to avoid

wetlands" and "potential off-site locations with less wetland impacts."[13]  In March, 2004, MBC

submitted a "Detailed Alternative Analysis," which included 14 pages of analysis of the North

---

Commission, the Arkansas Highway and Transportation Department, the Arkansas Geological
Commission, the State Technical Review Committee, Governor Mike Huckabee, North Little
Rock Mayor Patrick Hays, Arkansas Nature Alliance, Inc., the American Fisheries Society, and
the Arkansas Chapter of the American Fisheries Society.

[9]AR at 456.  The FWS commented that the Shoppes, as proposed, "would adversely and
cumulatively affect the hydrology, habitat, and organisms within this wetland complex and the
Arkansas River . . . ."  AR at 480.

[10]The FWS approved on January 5, 2005, and the EPA approved on February 16, 2005.

[11]AR at 618.

[12]AR at 1244.

[13]AR at 616-618, 651.

Hills site, and a total of 8 pages of analysis with respect to the other four sites.[14]  The Corps

found this "Alternative Analysis" unsatisfactory, and MBC submitted a second "Alternative

Analysis" report on October 27, 2004.[15]  Still, the Corps noted that MBC's Alternative Analysis

lacked objectivity and overemphasized the North Hills site.[16]  This opinion was shared by FWS

personnel, who, in December, 2004, believed that the "developers clearly did not follow

procedures requiring that they provide an appropriate alternative analysis . . . ."[17]

   After reviewing the Alternative Analysis, the Corps determined that none of the

alternative sites -- except the Otter Creek site -- would meet MBC's stated objectives.  However,

MBC's Alternative Analysis concluded that the Otter Creek site was not for sale -- MBC

attempted to negotiate with the owner of the site, but the owner had no interest in selling it.[18]  At

a meeting on November 4, 2004, the Corps questioned whether the Otter Creek site was or had

been available, and directed MBC to provide documentation supporting its position, "or else

Otter Creek appeared to be a logistically good site."[19]

   On November 16, 2004, the Corps initiated an investigation into the availability of the

Otter Creek site, and discovered that Mr. Tommy Hodges ("Hodges"), owner of the Otter Creek

---

[14]AR at 690, 714-721.

[15]AR at 866-1069.

[16]AR at 1070.  The Corps also thought the analysis too quickly dismissed certain properties as being unavailable; failed to consider additional construction costs at the North Hills site; and did not discuss access costs.

[17]AR at 1254.

[18]AR at 1074.

[19]*Id.*  The Corps thought that the Otter Creek site was "comparable to the preferred site." AR at 1073.

site,[20] "would sell the property . . . [and] would be willing to sit down and negotiate at any

time."[21]  Around that time, MBC provided the Corps with a letter from real estate agent Jim

Hathaway that indicated that on March 4, 2004, the Otter Creek site was not for sale.[22]  The

Corps told MBC that it had information to the contrary, but MBC again dismissed the

availability of the property; this time MBC was "concerned about controversy over competition

as the opposing developer."[23]

After visiting the Otter Creek site, the Corps concluded that it was "an ideal site for

development and had wetlands that could be used for educational purposes."[24]  At a December 9,

2004, meeting, the Corps continued to push the Otter Creek site as an alternative, because it met

all MBC's stated objectives.[25]  Yet, MBC continued to assert that "the owner would not sell to

them."[26]  On February 2, 2005, the Corps again contacted Hodges, who relayed that originally

Bass Pro Shops considered his land but "financially Bass Pro swayed to the North Little Rock

site."[27]  Hodges said he contacted MBC about working with them and they "rejected his offer"

and he "offered them the property but no price or negotiation was ever conducted."[28]

---

[20]Hodges was co-owner and spokesperson for the owners of the Otter Creek site.

[21]AR at 1076.

[22]AR at 1078.  The November 17, 2004, letter reads, in part: "I personally contacted Mr. Thomas L. Hodges, the Managing Member of the Otter Creek, LLC, on March 4, 2004 . . . [and he] told me that the property in question was not being offered for sale . . . ."

[23]AR at 1079.

[24]AR at 1251.

[25]AR at 1244.

[26]*Id.*

[27]AR at 1373.

[28]*Id.*

### 2.      Highway Access and Transportation Effects

Shortly after the Corps issued the Public Notice, the EPA pointed out that "the site chosen for development currently has no direct access from the adjacent highway.  If a new access is to be constructed this design should have been part of the public notice."[29]  According to the FWS, MBC's "application did not address the cumulative effects of this project, such as the additional transportation system construction and associated impacts . . . ."[30]

In its March 29, 2004, Alternative Analysis, MBC concluded that "[t]he Project will utilize . . . existing roadways for access to the site, requiring only minor improvement . . . [that] will not disturb any natural areas."[31]  MBC declared that "[a]ccessibility is crucial,"[32] and the site must have "adequate avenues of ingress and egress,"[33] but "[a]ny impact associated with the location and construction of a transportation system that might be issued to access the site is outside the scope of this permit request and will not be performed by the applicant."[34]  However, the Arkansas Highway and Transportation Department ("AHTD") determined that "[a]ny transportation related improvements or development as a result of this project will be the responsibility of the developer."[35]

---

[29]AR at 455.

[30]AR at 475.

[31]AR at 689-690.

[32]AR at 755.

[33]AR at 883.

[34]AR at 689.

[35]AR at 524.

In a February 2, 2004, meeting, the AHTD and Corps concluded that "[a]ccess out of the proposed project [would be] very difficult to overcome and limited."[36]  The Corps also acknowledged that "residential problems" could result from the construction.[37]

In its October 27, 2004, Alternative Analysis, MBC continued to disclaim any connection between the project and potential traffic/transportation issues.[38]  On November 9, 2004, the Corps requested information about road improvements and traffic patterns around the North Hills site.[39]  In response, MBC asserted that "North Little Rock was committed to widen the [access] road but no plans were in place."[40]

In December, 2004, the Corps informed MBC that an EIS might still be necessary to address traffic issues,[41] among other things, and that "safety issues would evolve" regarding traffic.[42]  After discussing its concerns with the Federal Highway Administration ("FHA"), the Corps issued questions about traffic impacts and safety to MBC on February 2, 2005.[43]  Six days later, MBC contacted the Corps and "expressed concern about [the Corps] conferring with AHTD personnel . . . ."[44]

---

[36]AR at 655.

[37]*Id.*

[38]AR at 904, 910, 920, 928, 939, 948.

[39]AR at 1074.

[40]AR at 1079.

[41]AR at 1244.

[42]AR at 1252.

[43]AR at 1368-1370.

[44]AR at 1396.

On February 18, 2005, the North Little Rock Mayor informed the Corps that with a few "adopted measures" the "increased volume of traffic associated with the project" would be addressed.[45]  Additionally, North Little Rock would "ensure that all necessary and required road infrastructures are provided."[46]

In its February 21, 2005, response to the Corps's traffic related questions, MBC conceded that "the present transportation systems surrounding the proposed site will experience congestion constraints and pose safety concerns as a result of the projected increased traffic volumes associated with the proposed project."[47]  However, MBC asserted that North Little Rock "has adopted five large-scale transportation improvements" that will take care of the potential traffic problems.[48]  According to MBC, the improvements will cost $8,000,000 and will be funded by North Little Rock, the AHTD, and MBC.[49]

On February 25, 2008, the Corps met with the FHA to discuss MBC's proposed traffic improvements.  The FHA criticized most of MBC's proposals and was "not in agreement" with the proposed measures -- contrary to MBC's position that "all agencies are in agreement that the proposed measures" would alleviate any traffic issues.[50]  The FHA believed that the "Texas Turnaround" was impractical and expensive; traffic would still find its way to some of the

---

[45]AR at 1435.

[46]*Id.*

[47]AR at 1461.

[48]AR at 1462.  The five proposed changes were: (1) improving access U.S. 67/167 to North Hills Blvd; (2) constructing a I-40 exit ramp; (3) reconfiguring the frontage road south of I-40; (4) building a "Texas Turnaround" at I-30 / 15th Street; and (5) constructing a connection from East 19th Street at I-30 to 19th Street at North Hills Blvd.  AR at 1462-64.

[49]AR at 1462.

[50]AR at 1501-02.

neighborhoods; traffic crossover was problematic; and funding was not available -- although it might become available.[51]   At a March 3, 2005, meeting, the Corps, the FHA, and the AHTD continued to discuss problems with MBC's traffic proposal.[52]   On March 3, 2005, the Coalition for Responsible Development submitted a traffic analysis[53] that criticized MBC's traffic proposal. On March 15, 2005, the Corps sent a letter to Sandra Otto of the FHA seeking comments on the "traffic implications of the proposed development;"[54] but Ms. Otto did not respond.

### 3.      Mitigation of Wetland Loss and Flood Storage

In May, 2004, MBC submitted a proposal for mitigating wetland loss based on the Charleston Method of Functional Assessment of Wetlands and hydrogeomorphic functional assessment.  MBC agreed to preserve, create, enhance, and restore 109.6 acres of wetlands and to enhance 2,920 linear feet of streams; MBC "will mitigate impacts at more than a 3 to 1 ratio."[55]   However, the Corps noted that under the Charleston Method, 383.7 credits for wetland impact were necessary and, at the time the EA was issued, MBC was 45.6 credits short.[56]

Under MBC's proposal, flood storage would increase by 1,112 cubic yards over the current amount.  The Corps reviewed MBC's plan and calculations, and concluded that the project would not increase the hydraulic flow of water into Redwood Tunnel.  In other words, the Corps concluded that the project would not increase the likelihood of flooding.

---

[51]AR at 1500.

[52]AR at 1512.

[53]AR at 1513.

[54]AR at 1553.

[55]AR at 1775.

[56]AR at 1831.

The Corps determined that the wetlands at the North Hills site currently have impaired quality and function, and concluded that MBC's mitigation measures would improve the wetlands in the area.[57]  In addition, a portion of the wetlands mitigation area will be used as an education and demonstration area with interpretive trails, and Arkansas State University intends to use the wetlands mitigation area for conservation and restoration research.

### D.    Approval

On April 19, 2005, the Corps issued a Department of the Army Permit Evaluation and Decision Document for Permit Application No. 18133, which contains an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI").[58]  However, the decision document is filled with mitigation measures;[59] requires monitoring by the Corps;[60] directs MBC to place perpetual deed restrictions on the mitigation property to guarantee the preservation of wetlands and wildlife habitat; and requires MBC to post a $250,000 performance bond to ensure

---

[57]AR at 1775.

[58]An EA is "a concise public document" that "briefly provide[s] sufficient evidence and analysis" for determining whether a proposed federal action may significantly affect the quality of the human environment. 40 C.F.R. § 1508.9.  If the EA determines that the proposed federal action will not significantly affect the environment, like it did here, the agency prepares a FONSI, which is a document that briefly presents the reasons why an action will not have a significant effect on the human environment. 40 C.F.R. § 1508.13.  If, however, the agency determines that the proposed action may significantly affect the environment, the agency will prepare an EIS that details the environmental impact of the proposed action. See 40 C.F.R. § 1501.4.

[59]Among other things, the mitigation requirements specify the species of vegetation MBC must plant; the type of weather in which MBC can work; the type of enhancement techniques MBC must use; the wildlife habitat MBC must construct; and the future maintenance MBC must perform.

[60]The Corps will monitor the success of the mitigation plan for seven years through mandatory reporting requirements and inspections.

the success and continued maintenance of the mitigation measures.[61]  Because it concluded that the Shoppes would not have a significant impact on the environment, the Corps did not prepare an Environmental Impact Statement ("EIS").

### E.      First Time in Court

After the Corps issued the permit, a group of individuals and organizations filed suit in the Eastern District of Arkansas.[62]  In May 2006, MBC's Motion for Summary Judgment was granted based on lack of standing; but the Order did not address the merits of the case.[63] Plaintiffs filed this case on December 5, 2007.

### D.      Current Motions

Defendants contend that they are entitled to summary judgment because: (1) Plaintiffs waived their claims by failing to participate at all in the Corps administrative proceeding; (2) the Corps adequately analyzed the cumulative impacts and indirect impacts of the Shoppes; (3) the Corps did not improperly "segment" the Shoppes; and (4) the project's impacts are not significant and do not warrant an EIS.[64]

Plaintiffs assert that: (1) an EIS should have been prepared; and (2) the Corps violated NEPA based on the significant number of omissions and deficiencies in the EA.[65]  Plaintiffs assert that since the Shoppes "could have" a significant effect on the quality of the human environment, the permit should be voided, and an EIS must be prepared.

---

[61]AR at 1834-39.

[62]The Honorable George Howard, Jr. was the presiding judge.

[63]*Ark. Nature Alliance, Inc., et. al v. Dept. of Defense*, No. 4:05-CV-00622-GH (E.D. Ark. filed April 20, 2005), Doc. No. 73.

[64]Doc. Nos. 15, 40-2.

[65]Doc. No. 23.

## III.    DISCUSSION

### A.    Administrative Exhaustion

MBC argues that it is entitled to summary judgment because Plaintiffs did not participate in the administrative proceedings, which waived any issues they have with the Administrative Record and decision.

In *Department of Transportation v. Public Citizen*, the Supreme Court held that "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the parties position and contentions' in order to allow the agency to give the issue meaningful consideration."[66]   Based on that case, MBC contends that potential plaintiffs are required to participate in the administrative hearings.[67]   Plaintiffs argue that any person can challenge administrative action in court so long as the agency had notice of the issues during the administrative process.[68]

Defendants' interpretation of *Public Citizen* is far too narrow.   The Supreme Court did not limit *who* could bring actions under NEPA based on participation in the administrative process; rather, it limited *what* could be raised in those actions.[69]   A party that did not participate in the administrative process may challenge the agency's decision in court so long as the party raises issues that were submitted by others during the administrative process.[70]

---

[66]*Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 764 (2004).

[67]Doc. No. 15.

[68]Doc. No. 23.

[69]*Public Citizen*, 541 U.S. at 764 (Holding that when particular objections to the EA are not raised during the comment period, a plaintiff "forfeit[s] any objection to the EA on [that] ground."); see also *New Mexico Environmental Imp. Div. v. Thomas*, 789 F.2d 825, 835 (Holding that when "neither [plaintiff] *nor anyone else* advanced any dissatisfaction to the EPA through comments . . . such issue has been waived.") (emphasis added).

[70]See *Wyoming Lodging and Restaurant Ass'n v. U.S. Dept. of Interior*, 398 F. Supp. 2d 1197, 1210 (D. Wyo. 2005) ("[S]o long as the agency is informed of a particular position and has

B.       **NEPA Claims**

1.       **Standard of Review**

The Administrative Procedure Act ("APA") sets out the standard of review in NEPA

cases.  Under the APA, an agency's administrative decision may be set aside only if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law";[71] "in

excess of statutory authority";[72] or "without observance of procedure required by law."[73]  The

Eighth Circuit has relied on four factors when determining whether the Corps's decision to move

forward based on an EA rather than an EIS is arbitrary and capricious:

(1)      whether the Corps "took a 'hard look' at the problem";

(2)      whether the Corps "identified the relevant areas of environmental concern";

(3)      "as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant"; and

(4)      "if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum."[74]

When reviewing an agency decision, a court must conduct a "searching and careful"

"factual inquiry" and determine "whether the decision was based on consideration of the relevant

---

a chance to address that particular position, any party may challenge the action based upon such position whether or not they actually submitted a comment asserting that position."); *Benton County v. U.S. Dept. of Energy*, 256 F. Supp. 2d 1195, 1198-99 (E.D. Wash. 2003) ("Under the rule established in *Vermont Yankee*, a plaintiff, or another, must bring sufficient attention to an issue to stimulate the agency's attention and consideration of the issue during the environmental analysis comment process.").

[71]5 U.S.C. § 706(2)(A).

[72]*Id.* at § 706(2)(C).

[73]*Id.* at § 706(2)(D).

[74]*Audubon Soc. Of Cent. Arkansas v. Dailey*, 977 F.2d 428, 434 (8th Cir. 1992).

factors and whether there has a been a clear error of judgment."[75]  The agency must provide a

satisfactory explanation for its actions based on relevant data.[76]  Deference is given to the

"agency's decision only when it is 'fully informed and well-considered.'"[77]

Under NEPA, an agency must prepare an EIS for all major federal actions[78] "significantly

affecting the quality of the human environment . . . ."[79]  "If substantial questions are raised

regarding whether the proposed action *may* have a significant effect upon the human

environment, a decision not to prepare an EIS is unreasonable."[80]  Said another way: when the

environmental effects of a proposed action are highly uncertain or involve unique or unknown

risk, an agency must prepare an EIS.[81]

---

[75]*Marsh v. Oregon Nat'l Resources Council*, 490 U.S. 360, 378 (1989).

[76]*Niobrara River Ranch, L.L.C. v. Huber*, 373 F.3d 881, 884 (8th Cir. 2004).

[77]*Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (quoting *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986)).  I realize that the Ninth Circuit reviews agency decisions for reasonableness.  However, "fully informed and well-considered" would also apply to the Eighth Circuit's "arbitrary and capricious" standard.  Additionally, the Supreme Court has found that "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence."  *Marsh*, 490 U.S. at 377, n.23.

[78]Without any discussion of the "major federal action" requirement, MBC argued that an "EIS was unnecessary because, due to MBC's extensive mitigation measures, the Project will not significantly impact the environment." So, I assume it concedes that this project is a "major federal action."

[79]42 U.S.C. § 4332(C).  "Affecting" is defined as "will or may have an effect on" the environment. 42 U.S.C. § 1508.27.

[80]*Save the Yaak Committee*, 840 F.2d at 717 (emphasis in original).

[81]*Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 870 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(b)(5)).

NEPA requires the reviewing agency to analyze the direct,[82] indirect,[83] and cumulative impacts[84] of a major federal action.  "An agency's decision not to prepare an EIS will be considered unreasonable if the agency failed to supply a convincing statement of reasons why potential effects are insignificant."[85]

### 2.    Alternative Sites

Under the Clean Water Act and NEPA, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact . . . ."[86]  "If a dredge or fill permit application does not concern a water-dependent project, the Corps assumes that practicable alternatives exist unless the applicant 'clearly demonstrated otherwise.'"[87]  "This presumption of practicable alternatives 'is *very* strong,'"[88] "creat[ing] an incentive for developers to avoid choosing wetlands when they

---

[82]"Direct effects . . . are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

[83]"Indirect effects . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

[84]"Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

[85]*Save the Yaak*, 840 F.2d at 717.

[86]40 C.F.R. § 230.10; 33 C.F.R. § 325, App. B.

[87]*Nat'l Wildlife Federation v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (citing 40 C.F.R. § 230.10(a)(3)).

[88]*Id.* (quoting *Buttrey v. United States*, 690, F.2d 1170, 1180 (5th Cir. 1982)).

could choose an alternative upland site."[89]   Additionally, an "Applicant must provide sufficient information on the need to locate the proposed activity in the wetland . . . ."[90]

### a.  Water-Dependent Project

In what appears to be an effort to bolster a claim that the Shoppes is "water-dependent," MBC repeatedly mentions, in correspondence, that the shopping center will contain "an adjacent nature wetland park, wetland demonstration area, and educational area"[91] and that the "wetland park . . . is essential to the success of the retail center . . . ."[92]   However, the Corps concluded that "the development . . . is not a water dependent activity . . . and not required to be situated near or within wetlands."[93]   In fact, the Corps re-defined the Shoppes purpose to "[t]he construction of an approximately 80-acre multi-tenant, multi-structure retail development in the Little Rock-North Little Rock Metropolitan area."[94]

### b.  Clearly Demonstrate No Practicable Alternative

Since the Shoppes is <u>not</u> a water-dependent activity, MBC's burden was to clearly demonstrate that no practicable alternative exists.  Plaintiffs contend that MBC failed to establish that no practicable alternative existed, and the Corps erred in concluding otherwise.

---

[89]*Nat'l Wildlife Federation v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (quoting *Bersani v. Robichaud*, 850 F.2d 36, 44 (2d Cir. 1988)).

[90]*Friends of the Earth v. Hintz*, 800 F.2d 822, 835, n.12 (9th Cir. 1986).

[91]AR at 687.

[92]AR at 688, 690.

[93]AR at 833.

[94]*Id.*

It is undisputed[95] that the "market entry approach" from *Bersani v. Robichaud*[96] is the appropriate standard for determining alternate site availability.  In the EA, the Corps concluded that no alternative sites were "available for purchase at the time the applicant entered the market."[97]  However, I can find no evidence in the record -- nor is any cited by the parties -- that the Corps considered whether the Otter Creek location was available at the time MBC "entered the market."  In fact, I was unable to find any definitive[98] evidence of when MBC actually purchased (a.k.a. "entered the market") the North Hills property.

Nevertheless, the Corps concluded in the EA that MBC's "agent contacted the current owner [of the Otter Creek site] and was told the site was not for sale and that the owners of this site were developing a competing retail project,"[99] and surmised that no practicable alternative existed.  In light of the contradictory evidence in the record, the Corps's conclusion, which lacked any explanation, was arbitrary and capricious.

MBC contends that Plaintiffs failed to cite any evidence that the Otter Creek site was available when it entered the market.  MBC's assertion neglects two important points: (1) there is no evidence in the record as to *when* MBC "entered the market"; and (2) the burden is on MBC, not Plaintiffs, to prove no alternative existed at the time it entered the market.

---

[95]See AR at 1817 (Corps's position) and Doc. No. 28 (In response to some suggested alternative sites, MBC argued that Plaintiffs "did not say whether the land was available at the time MBC entered the market.") (emphasis added).

[96]850 F.2d 36 (2d Cir. 1988).  Under the "market entry approach," alternative sites are "available" if they "had been available to [the applicant] at the time it entered the market to search for a site . . . ." *Id* at 38.

[97]AR at 1817.

[98]I can only assume it was before December 9, 200 --the date MBC submitted its application to the Corps.

[99]AR at 1813.

To summarize: (1) based on the record, the Corps neither gathered evidence nor determined the exact date MBC "entered the market"; and (2) it is unclear from the record how the Corps went from insisting that the Otter Creek site was an available alternative location to concluding that the site was not available.  Finally, MBC did not provide sufficient information on the <u>need</u> to locate the Shoppes in a wetland.  Accordingly, the Corps's conclusion that no practicable alternative to the North Hills site existed was arbitrary and capricious.

### 3.    Segmentation of Connected Action

Plaintiffs allege that the Corps improperly excluded (segmented) "project-related transportation modifications in the environmental statement for the project . . . ."[100]  According to Plaintiffs, the Shoppes and the transportation modifications are "connected actions" and must be considered in a single decision document.  On the other hand, MBC repeatedly disavowed any connection between its permit request and highway access or transportation issues[101] -- but simultaneously declared that "[a]ccessibility is crucial,"[102] and the site must have "adequate avenues of ingress and egress."[103]

Under NEPA, the Corps must consider "connected," "cumulative," and "similar" actions in a single EA or EIS.[104]  Connected actions are those that "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed

---

[100]Doc. No. 23.

[101]See AR at 689, 690, 697, 904, 910, 920, 928, 939, 948.

[102]AR at 755.

[103]AR at 883.

[104]40 C.F.R. § 1508.25.

unless other actions are taken previously or simultaneously; and (iii) [a]re interdependent parts of a larger action and depend on the larger action for justification."[105]

The Corps argues that the Shoppes and the transportation modifications are not "connected actions" for two reasons: (1) "some sort of improvement to highway and street infrastructure in this area of North Little Rock must occur whether the project is developed or not"; and (2) "the project and future highway and street improvements are within the expertise of different governmental agencies."[106]  Despite the Corps's position, and MBC's insistence that transportation improvements have nothing to do with its permit application, the record reflects that the Shoppes and the transportation improvements are connected actions.  In fact, the Corps concluded in the EA that the "proposed project . . . would _require_ additional infrastructure improvements and modifications.[107]

### a.  Improvements Would Happen Anyway

Other than the Corps's bare assertion, there is nothing in the record to indicate that either the city, state, or federal governments intended to make changes to the area, but for the presence of the Shoppes.  Notably, federal funds were allocated in early 2004 (after MBC submitted its request for a permit) because of the "potential for economic development in the North Hills area of North Little Rock."[108]  The funds were intended to be used on projects that would "alleviate congestion problems that would hinder that development . . . ."[109]  Based on both the timing of

---

[105]40 C.F.R. § 1508.25(a)(1).

[106]Doc. No. 40-2.

[107]AR at 1831 (emphasis added).

[108]AR at 1449.

[109]_Id._

the bill and numerous references in the Administrative Record, the Shoppes was the "economic development" at the heart of the bill.

Additionally, Defendants have ignored the fact that the Shoppes "cannot" be built unless the road infrastructure is improved; because, without the transportation improvements, there would be a significant impact on the human environment.  The EA reads:  "The applicant does recognize that additional proposed transportation systems would be <u>required</u> to access and leave the project site and to reduce or minimize traffic flows into residential areas."[110]  Finally, The EA repeatedly points out the necessity of transportation modifications:

> (1) Metroplan concluded that "if improvement measures were not made the project would cause an impact for the residential areas to the south and north of the project."[111]

> (2) "[I]t is likely traffic congestion would occur at this location because of the existing traffic lights that would result in backing traffic onto I-30 southbound if this mitigating measure is not addressed."[112]

> (3) "The proposed project would result in increased traffic and would require additional infrastructure improvements and modifications."[113]

### b.  Outside the Expertise of the Corps

The Corps argues that the Shoppes and necessary transportation infrastructure improvements are not "connected actions," because they are "within the expertise and jurisdictions of different governmental agencies."[114]  This position is baseless.  The Code of Federal Regulations specifically anticipated this problem.  The Code requires the Corps to

---

[110]AR at 1825-26 (emphasis added).

[111]AR at 1826.

[112]AR at 1828.

[113]AR at 1831.

[114]Doc. No. 40-2.

consider the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes the actions,"[115] and "emphasize[s] agency cooperation" when reviewing a project.[116] In fact, the Corps recognized that the FHA's transportation expertise was available, because the Corps had several discussions with the FHA. Considering this, the Corps's current position -- that transportation infrastructure improvements are outside the scope of its expertise -- is without merit.

### c. Summary of Connected Actions

When "it would be 'irrational, or at least unwise' to undertake one action without subsequent actions, the actions are connected."[117] Here, the Shoppes at North Hills could not be built without the transportation improvements and the proposed transportation improvements would not occur without the Shoppes at North Hills.  There is no need to improve traffic infrastructure leading to unimproved wetlands.  Accordingly, the two are "connected actions" and the Corps erred when it failed to properly analyze and consider the impact of the transportation improvement in the EA.

### d. Plaintiffs' Claims Related to Transportation Improvements

Plaintiffs assert arguments about the "inadequate analysis of indirect impacts of the Project on traffic, noise, safety, air quality, and water quality."[118]  However, based on my

---

[115]40 C.F.R. § 1508.7.

[116]See 40 C.F.R. § 1501.6 ("Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition, any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency.").

[117]*Baykeeper v. U.S. Army Corps of Engineers*, No. CIV. S-06-1908 FCD/GGH, 2006 WL 2711547, at *9 (E.D. Cal. Sept. 20, 2006) (quoting *Save the Yaak*, 840 F.2d at 720)).

[118]Doc. No. 43.

conclusion that the transportation improvements and the Shoppes are "connected actions," I need not specifically address these issues; they will, no doubt, be discussed in the Corps's EIS.

### 4.    Transportation System Improvements

Even if the transportation improvements were not "connected actions," the Corps's conclusion that the proposed transportation improvements sufficiently resolved any transportation concerns was arbitrary.

MBC asserts that Plaintiffs' traffic related claims fail as a matter of law, because on March 15, 2005, the Corps "requested further comment on the transportation improvements from FHA Division Administrator Sandra Otto" and "Ms. Otto did not make any comments in response."[119]  According to MBC, Ms. Otto's "silence can mean only that FHA had no comments."[120]

While it appears that Ms. Otto never responded to the Corps's March 15, 2005, letter -- something I find troubling in light of the circumstances -- MBC's arguments (and the Corps's conclusion in the EA) ignore the fact that on February 25, 2005, and March 3, 2005, the FHA strongly criticized the effectiveness, adequacy, and feasibility of MBC's proposed traffic improvements.[121] Additionally, on March 3, 2005, the Coalition for Responsible Development submitted a traffic analysis that thoroughly analyzed the flaws in MBC's proposal.[122]

Since neither the FHA's position nor the Coalition for Responsible Development's report was discussed in the EA's sections on traffic issues, one can only conclude that the Corps

---

[119]Doc. No. 28.

[120]*Id.*

[121]AR at 1500-1503, 1512.

[122]AR at 1513-1536.

considered neither in its analysis.  The Corps's summary judgment briefing fairs no better; it simply reiterates the conclusions made in the EA without mention of the FHA's position in February and March, 2005, or the Coalition for Responsible Development's analysis.

"When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its *own* qualified experts . . . ."[123]  Here, the Corps ignored its *own* qualified experts when it accepted MBC's traffic proposal wholesale, despite the FHA's strong criticisms of the proposal.  In fact, many questions remain unanswered: (1) are all of the improvements possible?;[124] (2) will each of the improvements be approved by the appropriate agency?;[125] (3) will the improvements actually fix the anticipated problems?;[126] (4) how much will the improvements cost?; (5) who will fund the improvements?;[127] (6) are public funds available and, if so, will they be used?[128]  Considering these unanswered questions, as well as the FHA's criticisms of MBC's transportation improvement proposals, the Corps acted capriciously

---

[123]*Marsh*, 490 U.S. at 378 (emphasis added).

[124]The FHA determined that several of the proposed improvements were either contrary to the evidence, unsupported, or simply not feasible.  See AR at 1501-02.

[125]The FHA felt that a thorough evaluation of the proposed "Texas Turnaround" was necessary to consider its usefulness.  Additionally, it seems to me that the improvements would need express approval from the FHA. At one point, the FHA said its "role would become much more involved in all aspects of the modification should Federal funds be involved." AR at 507. On January 23, 2004, Congress provided funds and directed the FHA and local traffic service to work together in the area.

[126]In February, 2005, the FHA did not believe that the proposed improvements would address the potential traffic problems.  AR at 1502.

[127]The AR is replete with contradictions regarding who exactly will pay for any improvements.

[128]On February 25, 2005, the Corps noted that "funding might be available at some time, but it was not certain.  Funding at this time was not available." AR at 1500.

when it concluded that the transportation improvements would not have a significant effect on the environment.

## CONCLUSION

After reviewing the entire record, I find that the Corps's findings either did not conform to the evidence, were not adequately explained, or were simply conclusory.  The Corps failed to make "a convincing case that the impact[s] [were] insignificant" or that "the changes in the project sufficiently reduced . . . to a minimum" any significant impacts.[129]  Moreover, the Corps improperly segmented the transportation improvements from the Shoppes.  Accordingly, the Corps's decision to proceed on and EA rather than an EIS was arbitrary and capricious.

I recognize that the parties advanced many issues -- other than Alternative Analysis and transportation improvements -- that were not discussed in this Order.  However, because the Corps's decision to issue an EA rather than an EIS was arbitrary and capricious, it was not necessary to address every other disputed issue.  When the Corps prepares the EIS, it will have the opportunity to reconsider the two issues specifically addressed in this Order, as well all the other issues that were advanced by the parties and commentators, *i.e.,* mitigation of wetland loss, flood storage, insufficient credits, noise, air pollution, effects on the Redwood Tunnel, safety, growth inducing effects, *etc*.

Since the Corps's decision to proceed with an EA rather than an EIS violated NEPA, Plaintiffs' Cross-Motion for Summary Judgment (Doc. No. 22) is GRANTED.  Accordingly, the Corps is directed to revoke Permit No. 18133.  Defendants are enjoined from proceeding with the clearing or construction of the Shoppes at North Hills until the Corps prepares an EIS that complies with NEPA.

---

[129]*Audubon Soc. Of Cent. Arkansas v. Dailey*, 977 F.2d 428, 434 (8th Cir. 1992).

Defendants' Motions for Summary Judgment (Doc. Nos. 13, 40) are DENIED.

Plaintiffs' Motion to Supplement Administrative Record (Doc. No. 25) and Defendants' Motion

to Strike Plaintiffs' Motion to Supplement Administrative Record (Doc. No. 39) are DENIED as

MOOT.

IT IS SO ORDERED this 5th day of November, 2008.


/s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE